AGREEMENT

Dated as of December 15, 1977

between

T. D. Lumber Company

and

All of the Shareholders

of

Dixon Lumber Company, Inc.

EXHIBIT

2

## TABLE OF CONTENTS

Page

Section 1.   Representations and Warranties of the
             Shareholders.................................... 2

    (a)   Organization and Qualification, etc., of
          Dixon.......................................... 2

    (b)   Capital Stock of Dixon......................... 2

    (c)   Subsidiaries of Dixon.......................... 3

          (i)   Lockhart Lumber Company, Inc............. 3

          (ii)  D and D Lumber Company, Inc.............. 3

          (iii) Conecuh Lumber Company, Inc............. 4

          (iv)  Organization and Qualification, Etc., of
                the Subsidiaries........................ 4

          (v)   Other Stock Ownership................... 5

    (d)   Charter and By-Laws of Subsidiaries........... 5

    (e)   Financial Statements.......................... 6

    (f)   Undisclosed Liabilities....................... 7

    (g)   Plant, Property (Other than Timberland) and
          Equipment..................................... 8

    (h)   Taxes......................................... 8

    (i)   Adverse Changes............................... 10

    (j)   Conflicts With Other Agreements.............. 10

    (k)   Interests in Real and Personal Property....... 10

    (l)   Schedules..................................... 12

    (m)   Default Under Other Agreements............... 16

    (n)   Litigation.................................... 17

i

Page

(o)   Employee Retirement Income Security Act
      of 1974.................................    17

(p)   Shareholders...............................    18

(q)   Dividends..................................    18

(r)   Receivables................................    18

(s)   Inventory..................................    19

(t)   Brokers or Finders.........................    19

Section 2.   Representations and Warranties of the
             Purchaser..................................    19

(a)   Organization and Authorization............    19

(b)   Conflicts With Other Agreements...........    20

Section 3.   Purchase and Sale of Dixon Stock...........    20

(a)   Agreement to Transfer Dixon Stock.........    20

(b)   Purchase Price............................    20

(c)   Payment of Purchase Price.................    20

(d)   Closing...................................    22

(e)   Delivery of Certificates..................    23

Section 4.   Certain Covenants of the Shareholders.........    23

(a)   Affirmative Obligations...................    23

(b)   Negative Covenants........................    25

(c)   Accuracy of Representations and Warranties....    27

(d)   Fees and Expenses of Shareholders.........    28

(e)   Title Examination.........................    28

(f)   Surveys, Plans and Specifications.........    29

ii

Page

(g)   Estoppel Certificates.......................... 29

(h)   Indemnification................................ 29

(i)   Antitrust Litigation.......................... 30

Section 5.   Conditions Precedent to the Purchaser's
             Obligations................................... 31

(a)   Noncompetition Agreements...................... 31

(b)   Management Contract............................ 31

(c)   Purchase and Sale Agreement.................... 31

(d)   Purchase of Conecuh Stock...................... 32

(e)   Opinion of Counsel............................. 32

(f)   Certificate Regarding Liens and Claims........ 34

(g)   Evidence of Good Title......................... 34

(h)   Officers' Certificates......................... 34

(i)   Certificate Regarding Representations and
      Warranties.................................... 35

(j)   Performance of Obligations..................... 35

(k)   Resignations.................................. 35

(l)   Absence of Legal Proceedings................... 35

(m)   Transfer of All Dixon Stock................... 36

Section 6.   Conditions Precedent to the Shareholders'
             Obligations................................... 36

(a)   Accuracy of Representations and
      Warranties, Etc............................... 36

(b)   Delivery of Consideration...................... 36

(c)   Indemnification Agreement...................... 36

(d)   Opinion of Counsel............................. 37

(e)   Performance of Obligations..................... 37

iii

|  |  |  | Page |
|---|---|---|---|
| Section 7. | | Termination, Waiver, Etc........................ | 37 |
| | (a) | Termination by the Shareholders................ | 37 |
| | (b) | Remedies of Purchaser.......................... | 37 |
| | | (i)   Termination by the Purchaser............ | 37 |
| | | (ii)  Defects of Title, Damage to Property, Etc.......................... | 38 |
| | | (iii) Nondelivery of Shares of Dixon Stock................................. | 39 |
| | (c) | Waiver......................................... | 39 |
| | (d) | Specific Performance, Other Remedies.......... | 39 |
| Section 8. | | Survival after Closing........................ | 39 |
| | (a) | Survival of Representations, Etc.............. | 39 |
| | (b) | Liability of the Shareholders................. | 40 |
| | (c) | How Payable................................... | 41 |
| | (d) | Notice of Claims, Etc......................... | 41 |
| | (e) | Arbitration................................... | 42 |
| Section 9. | | Miscellaneous................................. | 43 |
| | (a) | Notice........................................ | 43 |
| | (b) | Successors and Assigns........................ | 44 |
| | (c) | Effectiveness of Agreement.................... | 44 |
| | (d) | Governing Law................................. | 44 |
| | (e) | Captions...................................... | 44 |
| | (f) | Entire Agreement.............................. | 44 |

iv

## EXHIBITS

Exhibit A – Charter and By-laws of Dixon, Lockhart, D & D and
            Conecuh, respectively, delivered to Purchaser
            pursuant to Section 1 (d)

Exhibit B – Financial Statements described in Section 1 (e)

Exhibit C – Description of Interests in Real Properties of Dixon
            and the Subsidiaries, including description of
            facilities located thereon and all liens and
            encumbrances to which such properties are subject,
            all as required by Section 1 (k) (together with
            documents required to be attached to such Exhibit)

Exhibit D – Schedules delivered pursuant to Section 1 (l)
            (together with documents required to be attached
            to such Exhibit)

Exhibit E – Schedule of Litigation

Exhibit F – Form of Escrow Agreement to be executed and
            delivered pursuant to Section 3 (c)

Exhibit G – Form of Note to be delivered to each of the
            Shareholders pursuant to Section 3 (c)

Exhibit H – Form of Guaranty of Note to be delivered pursuant to
            Section 3 (c)

Exhibit I – Form of Noncompetition Agreement to be executed
            by individual Shareholders at the request of the
            Purchaser pursuant to Section 5 (a)

Exhibit J – Form of Management Contract to be entered into
            by the Purchaser and certain of the Shareholders
            pursuant to Section 5 (b)

Exhibit K – Form of Purchase and Sale Agreement to be entered
            into by the Purchaser and certain of the
            Shareholders pursuant to Section 5 (c)

Exhibit L – Form of Agreement to be entered into by the Purchaser
            and Edwin McIntyre pursuant to Section 5 (d)

## AGREEMENT

This Agreement made as of the 15th day of December, 1977, between T. D. Lumber Company, a Delaware corporation, (the "purchaser") and the owners and holders of all of the issued and outstanding capital stock of Dixon Lumber Company, Inc., a Delaware corporation, ("Dixon") whose names are set forth in Section 1 (p) hereof (such shareholders are hereinafter collectively referred to as the "Shareholders" and, individually, as a "Shareholder").

WHEREAS, the Shareholders have agreed to sell to the purchaser, and the Purchaser has agreed to buy from the Shareholders, all of the issued and outstanding shares of capital stock of Dixon on the terms and conditions herein set forth; and

WHEREAS, certain of the Shareholders have also agreed to sell to the Purchaser approximately 18,508 acres of timberland located in the States of Alabama and Florida; and

WHEREAS, certain of the Shareholders have also agreed to enter into a Management Contract with the Purchaser providing, among other things, for the management by the Purchaser of approximately 60,000 acres of timberland owned by such Shareholders; and

WHEREAS, the holder of all of the issued and outstanding shares of capital stock of Conecuh Lumber Company, Inc., which are not owned by Dixon has agreed to sell the Purchaser all of such shares held by him;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the Purchaser and the shareholders agree as follows:

SECTION 1.  Representations and Warranties of the shareholders.  The Shareholders represent and warrant to the purchaser as follows:

(a)    Organization and Qualification, etc., of Dixon. Dixon is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, has full power and authority, corporate and otherwise, to carry on its business as it is now being conducted and to own or hold under lease the properties and assets it owns or holds under lease, and is duly qualified to do business and is in good standing in the states of Alabama and Florida, which states are the only jurisdictions in which the failure to be so qualified or in good standing would have an adverse effect on Dixon; and there is no action, suit or proceeding pending or, to the knowledge of the Shareholders, threatened against Dixon by or before any licensing, taxing or other governmental agency or judicial forum which challenges the right or ability of Dixon to transact its business in, or to own or lease its properties located in, any jurisdiction.

(b)    Capital Stock of Dixon.  The authorized capital stock of Dixon consists of 5,000 shares of Common Stock ("Dixon Stock"), without par value, of which, as of the date hereof, 3,600 shares were validly issued and outstanding, fully paid

2

and nonassessable.  There is no existing option, warrant,
right, call or commitment of any character relating to Dixon's
authorized and unissued capital stock.  There are no existing
restrictions (except restrictions contained in the by-laws of
Dixon and restrictions pursuant to applicable Federal and state
securities laws) upon the transfer of any shares of Dixon Stock.

(c)  Subsidiaries of Dixon.

(i)  Lockhart Lumber Company, Inc.  Dixon owns all
of the issued and outstanding capital stock of Lockhart Lumber
Company, Inc., an Alabama corporation ("Lockhart").  The
authorized capital stock of Lockhart consists of 2,500 shares
of Common Stock, par value $50 per share, of which, as of the
date hereof, 800 shares were validly issued and outstanding,
fully paid and nonassessable.  There is no existing option,
warrant, right, call or commitment of any character relating to
Lockhart's authorized and unissued capital stock.  There are no
existing restrictions (except restrictions pursuant to
applicable Federal and state securities laws) upon the transfer
of any shares of capital stock of Lockhart.

(ii)  D and D Lumber Company, Inc.  Lockhart owns
all of the issued and outstanding shares of capital stock of D
and D Lumber Company, Inc., a Delaware corporation ("D & D").
The authorized capital stock of D & D consists of 500 shares of
Preferred Stock, par value $100 per share, none of which was
issued or outstanding as of the date hereof, and 1,500 shares
of Common Stock, par value $100 per share, all of which were

3

validly issued and outstanding, fully paid and nonassessable as of the date hereof.  There is no existing option, warrant, right, call or commitment of any character relating to D & D's authorized and unissued capital stock.  There are no existing restrictions (except restrictions pursuant to applicable Federal and state securities laws) upon the transfer of any shares of capital stock of D & D.

(iii) Conecuh Lumber Company, Inc.  Dixon owns 300 of the 450 issued and outstanding shares of Common Stock of Conecuh Lumber Company, Inc., an Alabama corporation ("Conecuh").  The authorized capital stock of Conecuh consists of 600 shares of Common Stock, par value $100 per share, of which, as of the date hereof, 450 were validly issued and outstanding, fully paid and nonassessable.  The 150 issued and outstanding shares of Conecuh Common Stock which are not owned by Dixon are owned of record at the date hereof by Edwin McIntyre.  There is no existing option, warrant, right, call or commitment of any character relating to Conecuh's authorized and unissued capital stock.  There are no existing restrictions (except restrictions pursuant to applicable Federal and state securities laws) upon the transfer of any shares of capital stock of Conecuh.

(iv)  Organization and Qualification, Etc., of the Subsidiaries.  Lockhart, D & D and Conecuh are hereinafter collectively referred to as the "Subsidiaries" and separately, a "Subsidiary".  Each Subsidiary is a corporation duly

4

organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation. Lockhart is duly qualified to do business and is in good standing in the states of Alabama and Florida; D & D is duly qualified to do business and is in good standing in the state of Alabama; and Conecuh is duly qualified to do business and in good standing in the state of Alabama. The states in which each Subsidiary is qualified to do business are the only states in which failure to be so qualified and in good standing would have an adverse effect on such Subsidiary. There is no action, suit or proceeding pending or, to the knowledge of the Shareholders, threatened against any Subsidiary by or before any licensing, taxing or other governmental agency or judicial forum which challenges the right or ability of any Subsidiary to transact its business in, or to own or lease its properties located in, any jurisdiction. Each Subsidiary has full power and authority, corporate and otherwise, to carry on its business as it is now being conducted and to own or hold under lease the properties and assets it owns or holds under lease.

(v)   Other Stock Ownership.  Except for an investment in stock of the Federal Land Bank valued at $50,000 and the capital stock of the Subsidiaries owned by Dixon as set forth above, neither Dixon nor any of the Subsidiaries owns any capital stock of any other corporation.

(d)   Charter and By-Laws of Subsidiaries.  The charter and by-laws of Dixon and each of the Subsidiaries, complete and

5

correct copies of which are attached as Exhibit A hereto, are in full force and effect at the date hereof.

(e)    Financial Statements.    Attached hereto as Exhibit B are the following financial statements (the "Financial Statements") of Dixon and the Subsidiaries, prepared and signed by Gordon S. Jones & Company:  (i) unaudited balance sheets of Dixon and the Subsidiaries as of September 30, 1977, and in addition of Conecuh as of June 30, 1977; and (ii) related statements of income and retained earnings for the fiscal year ended September 30, 1977, for Dixon, D & D, and Lockhart and for the fiscal year ended June 30, 1977, and for the first quarter ended September 30, 1977, for Conecuh.  The Financial Statements have been prepared from the books and records of Dixon and the Subsidiaries.  The books and records of Dixon and the Subsidiaries are correct and complete and the Financial Statements present fairly the financial condition of such companies as of the respective dates of the balance sheets included therein (the "Balance Sheet Dates") and the results of operations of such companies for the periods indicated in said statements.  At their respective Balance Sheet Dates, Dixon and the Subsidiaries had no liabilities, absolute or contingent, not shown or provided for on the balance sheets included in the Financial Statements, except as set forth in the Exhibits delivered concurrently herewith; and since such Balance Sheet Dates there has been no material adverse change

6

in the business or condition, financial or otherwise, of Dixon or any of the Subsidiaries. Neither Dixon nor any of the Subsidiaries is in default in respect of any of the terms and conditions of any indebtedness or any indenture securing such indebtedness. Any payments by Dixon and any of the Subsidiaries with respect to any of their obligations have been made since their respective Balance Sheet Dates only from cash on hand at the time or from cash generated from the operations of such companies.

(f)    Undisclosed Liabilities. Except as disclosed in writing to the Purchaser, neither Dixon nor any of the Subsidiaries (i) had, as of their respective Balance Sheet Dates, any debts, liabilities or obligations whether accrued, absolute, contingent or otherwise and whether due or to become due, except to the extent set forth in or provided for in the Financial Statements or the Schedules required to be delivered pursuant to this Agreement, (ii) has incurred since their respective Balance Sheet Dates any debts, liabilities or obligations other than debts, liabilities or obligations of the same nature as those set forth in the Financial Statements or the Schedules required to be delivered pursuant to this Agreement, reasonably incurred in the ordinary course of business after their respective Balance Sheet Dates, (iii) is a party to any contract or agreement which materially adversely affects or in the future may (so far as the Shareholders can

7

now reasonably foresee) materially adversely affect the business or condition (financial or other) of such company or (iv) has conducted business otherwise than in the ordinary course since their respective Balance Sheet Dates.

(g)  **Plant, Property (Other than Timberland) and Equipment.**  All items of plant, property (other than timberland) and equipment shown on the balance sheets of Dixon and the Subsidiaries included in the Financial Statements are utilized in the operations of Dixon and the Subsidiaries, and in general are well maintained and in good operating condition (subject to ordinary wear and tear) and are considered adequate for present needs and insofar as the Shareholders can now reasonably foresee, as supplemented by planned construction, are expected to remain adequate for the near future.

(h)  **Taxes.**

(i)  All federal, state and other tax returns of Dixon and the Subsidiaries required by law to be filed have been filed and are complete and correct in all material respects, and all federal, state and other taxes, assessments, fees and other governmental charges which have been assessed against any such company, or against their respective properties or other assets, and which are due and payable, have been paid, except for taxes, assessments, fees and charges whose amount, applicability or validity are being contested in good faith.

8

(ii)   All federal income tax returns of Dixon and the Subsidiaries which have joined with Dixon in filing consolidated federal income tax returns (i.e. Lockhart and D & D) for the fiscal years ended September 30, 1969, through September 30, 1973, have been audited by the Internal Revenue Service.  Except as disclosed to the Purchaser in writing, all deficiencies assessed as a result of audits heretofore completed or now in progress after allowing for offsetting future tax benefits, have either been paid in full or are adequately provided for in the reserves for payment of federal and state income taxes of Dixon as reflected in the Financial Statements.

(iii)   The federal income tax return of Conecuh for the fiscal year ended June 30, 1975, has been audited by the Internal Revenue Service.  Except as disclosed to the Purchaser in writing, all deficiencies assessed as a result of audits heretofore completed have either been paid in full or are adequately provided for in the reserves for payment of federal and state income taxes of Conecuh as reflected in the Financial Statements.

(iv)   All state tax returns of Dixon, Lockhart and D & D through the fiscal year of each ended September 30, 1976, and of Conecuh through its fiscal year ended June 30, 1977, have been filed and all state taxes including, but not limited to, state income, franchise and sales taxes, have been paid in

9

full or are adequately provided for in the reserves for the payment of taxes as reflected in the Financial Statements. The Financial Statements do not include, however, provisions for current ad valorem taxes or franchise taxes.

(i)    Adverse Changes. Except as disclosed in writing to the Purchaser, since their respective Balance Sheet Dates there has not been any material adverse change in the business or condition (financial or other) of Dixon or of any Subsidiary or in the prospective business or condition (financial or other) of Dixon or of any Subsidiary insofar as the Shareholders can, or reasonably should be able to, foresee.

(j)    Conflicts With Other Agreements. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated herein will violate or constitute a default under any provision of the charter or by-laws of Dixon or of any Subsidiary or of any agreement or instrument to which any such company is a party or by which any of its properties may be affected.

(k)    Interests in Real and Personal Property. The Shareholders have delivered to the Purchaser the attached Exhibit C, which contains a description of (i) all real properties owned by or leased to Dixon or a Subsidiary, including all plants and other buildings and the principal facilities located thereon (ii) all real properties, other than those owned by or leased to Dixon or a Subsidiary, as to which

10

Dixon or a Subsidiary has a right to the cutting or use of timber growing thereon or to manage forestation thereon and (iii) all personal property owned by or leased to Dixon or a Subsidiary with a value of $1,000 or more. Dixon and the Subsidiaries have (i) good and marketable title in fee simple to all such owned real property, (ii) valid and subsisting leaseholds on all of their leased properties, and (iii) valid and subsisting rights to cut and/or purchase and/or use timber or other forests products from, or to manage forestation on, such properties not so owned or leased as set forth in the contracts creating such rights, and (iv) good and marketable title to all their other properties and assets. The real property owned by or leased to Dixon or a Subsidiary and the personal property owned by Dixon or a Subsidiary is subject to no lien, mortgage, pledge, encumbrance or charge of any kind or any other interest of other parties therein, except as set forth in Exhibit C and except liens for taxes not yet due. There is no pending or threatened condemnation or other legal action affecting such properties described in Exhibit C or the assets or operations of Dixon or the Subsidiaries thereon. Copies of all leases to which Dixon or any of the Subsidiaries is a party and copies of all management contracts, cutting rights contracts or other contracts pursuant to which Dixon or any of the Subsidiaries is a party are attached to Exhibit C. Dixon and the Subsidiaries are not conducting their operations

11

on any real property other than that described in Exhibit C, and all of their operations are conducted in accordance with all laws, rules, regulations and ordinances applicable thereto. Either Dixon or a Subsidiary, as the case may be, owns outright all of the machinery, equipment, furniture and fixtures located in or on the real properties owned by or leased to Dixon or a Subsidiary described in Exhibit C and except as disclosed in writing to the Purchaser, neither Dixon nor any Subsidiary owns, leases or has any interest in any other machinery, equipment, furniture or fixtures other than the machinery, equipment, furniture and fixtures located in or on real properties owned by or leased to Dixon or a Subsidiary.

(1)    _Schedules._  The Shareholders have delivered to the Purchaser the attached Exhibit D which consists of schedules which list or summarize the following, as of the respective dates stated therein (which are the most recent practicable dates as of which the information included therein is available):

(i)    Policies of insurance in force with respect to Dixon or any Subsidiary or their assets and properties. Copies of all such policies are attached hereto as part of Exhibit D.

(ii)    All loan and credit agreements or instruments of indebtedness and all employment or consulting agreements, and all other agreements or commitments not terminable by Dixon

12

or any Subsidiary on 30 days' notice or less (other than trade accounts receivable or payable) involving payments by Dixon or any Subsidiary of more than $5,000. Copies of all such documents are attached hereto as part of Exhibit D.

(iii)  All employee profit-sharing, pension, retirement, bonus, hospital, medical, disability, welfare or other benefit plans or similar written agreements of Dixon or any Subsidiary (hereinafter collectively referred to as the "Employee Benefit Plans"), including each trust or other agreement with any custodian or any trustee of funds held under any such agreement, plan or arrangement, together with, in respect of any of them, current reports filed with the United States Department of Labor, the United States Internal Revenue Service and the Pension Benefit Guaranty Corporation, any related current financial or actuarial reports, and any currently effective United States Internal Revenue Service rulings or determination letters. Copies of all such documents are attached hereto as part of Exhibit D.

(iv)  The name and current annual salary of each director, officer and employee of Dixon or any Subsidiary, whose current annual salary is in excess of $15,000, and the profit-sharing, bonus or any other form of compensation (other than salary) paid or payable by Dixon or any Subsidiary to or for the benefit of each such person for the most recent fiscal year of such company.

13

(v)    Each partnership, joint venture, trust or other business association in which Dixon or a Subsidiary has an equity interest or investment and a description of such interest or investment.

(vi)    All patents, trademarks, trade names and copyrights and applications for any thereof, domestic or foreign, owned by or registered in the name of Dixon or any of the Subsidiaries or in which any thereof has any rights other than rights arising under a license referred to in paragraph (vii) below.  Dixon and its Subsidiaries own or hold licenses under such patents, trademarks, trade names and copyrights as they deem necessary for the conduct of their respective businesses as now being conducted, and, except as set forth in Exhibit D, none of them is currently in receipt of any notice of infringement or notice of conflict with the asserted rights of others in such patents, trademarks, trade names and copyrights.

(vii)   All licenses granted by others to Dixon or any of the Subsidiaries with respect to the production, manufacture or sale of any of the products thereof, and all licenses granted by Dixon for any product under any patent held or registered in the name of Dixon or any of the Subsidiaries or under any process or technical "know-how" which is the property of Dixon or any of the Subsidiaries.  The licensor and licensee in each such license is identified in Exhibit D.

14

(viii) Each project, the cost of which would be capitalized under generally accepted accounting principles, of Dixon and of each of the Subsidiaries in excess of $1,000 authorized by the management of Dixon which was not completed at the date hereof and the estimated cost of completion of each such authorized capital project.

(ix) All contracts for the purchase of materials and supplies in excess of normal requirements or for the purchase or sale of products over a period of more than thirty days, true and complete copies of all of which have heretofore been made available to the Purchaser and are attached hereto as a part of Exhibit D.

(x) All contracts and commitments (whether written or oral) to which Dixon or any of the Subsidiaries is a party which does or could involve the payment by any party of more than $1,000 and which are not otherwise required to be described in Exhibits C or D, including, without limitation, leases of equipment, life or hospitalization insurance plans, loan agreements and guarantees, consulting agreements (including agreements for the services of accountants, auditors, business consultants and lawyers), true and complete copies of all of which have heretofore been made available to the Purchaser and are attached hereto as a part of Exhibit D.

(xi) All bank accounts of Dixon and the Subsidiaries, the amounts in each such bank account, all time

15

deposits, certificates of deposit and other deposits, and all notes, bonds and other evidences of indebtedness owed to Dixon and the Subsidiaries for money loaned. Copies of all such notes, bonds and other evidences of indebtedness are attached hereto as a part of Exhibit D.

(xii)  All of the automobiles, trucks and trailers and other rolling stock owned by Dixon and the Subsidiaries or leased to such companies and identified in each instance as to whether the same is owned or leased.

(m)  Default Under Other Agreements.  Neither Dixon nor any of the Subsidiaries is in default, or alleged to be in default, under any loan agreement or other agreement related to indebtedness for money borrowed, nor is Dixon or any of the Subsidiaries in default, or alleged to be in default, so as, presently, or at any future time, to affect adversely the business or condition (financial or other) of Dixon or any Subsidiary or insofar as the Shareholders can, or reasonably should be able to, foresee the prospective business or condition (financial or other) of Dixon or any Subsidiary, or any of their respective properties under any other agreements, instruments or obligations.  No party with whom Dixon or any of the Subsidiaries has an agreement material to the current or prospective business or condition (financial or other) of Dixon or any Subsidiary is known by the Shareholders to be in default thereunder.

16

(n)   <u>Litigation</u>.  Except as set forth in the attached Exhibit E there are at the date of this Agreement no actions, suits, governmental investigations or proceedings pending or, to the knowledge of the Shareholders, threatened against Dixon or any of the Subsidiaries, or the assets or business of Dixon or any of the Subsidiaries.

(o)   <u>Employee Retirement Income Security Act of 1974</u>. Neither Dixon nor any Subsidiary has incurred any accumulated funding deficiency within the meaning of the Employee Retirement Income Security Act of 1974 with respect to any Employee Benefit Plan, incurred any liability to the Pension Benefit Guaranty Corporation established under such Act or breached any of the responsibilities, obligations or duties imposed on them by such Act with respect to any such plan that in the aggregate may have an adverse effect on the current or prospective business or condition (financial or other) of Dixon or any Subsidiary.  Since December 31, 1976, neither Dixon nor any Subsidiary has taken any action which would constitute a termination or partial termination with respect to any Employee Benefit Plan of Dixon or any Subsidiary which is subject to the Employee Retirement Income Security Act of 1974 other than the profit sharing plans of Lockhart and D & D which plans were terminated by action of the respective Board of Directors of Lockhart and D&D subject to receipt of a favorable determination by the Internal Revenue Service.

17

(p)    Shareholders.  The Shareholders are now, and at the Date of Closing will be, the lawful owners of the number of shares of Dixon Stock set forth below opposite each of their names, in each case free and clear of all liens, encumbrances, charges and assessments and free of any restrictions with respect to their transfer:

| Name of Shareholder | Number of Shares |
|---|---|
| Estate of Charles Dixon, Deceased | 450 |
| Thelma Dixon | 450 |
| Solon Dixon | 450 |
| Trust under will of of Ellie Dixon, Deceased | 450 |
| C. M. Jackson | 450 |
| Grover Little | 270 |
| Grover Nell Little Tadlock | 90 |
| Terrell D. Little | 90 |
| John E. Vick | 225 |
| Catherine D. Roland | 450 |
| Trust under will of of Marjorie Dixon Vick Deceased | 225 |
| Total | 3,600 |

(q)    Dividends.  Since December 31, 1976, no dividends have been declared or paid by Dixon or Conecuh.

(r)    Receivables.  The accounts receivable (trade and sundry) shown on the balance sheets included in the Financial Statements have been collected, or are collectible within six months of the date incurred, in amounts not less than the book amounts thereof, and the notes receivable shown on the balance sheets included in the Financial Statements have been collected or are collectible when due.

18

(s)    Inventory.  All finished goods included in the
inventories shown on the balance sheets included in the
Financial Statements which have not been sold or utilized in
the business of Dixon or the Subsidiaries are saleable in the
ordinary course of business within six months from the date
hereof for not less than the book value of such finished goods
and all raw materials included in the inventories shown on the
balance sheets included in the Financial Statements which have
not been utilized in the business of Dixon or the Subsidiaries
will be utilized in such business and the finished goods
produced therefrom will be saleable in the ordinary course of
business within six months from the date hereof for not less
than the book value thereof.

(t)    Brokers or Finders.  The Shareholders have not
retained any broker or agreed to pay any brokerage or finders
fees or commissions to any agent, broker or finder for or on
account of this Agreement and the sale of Dixon Stock
contemplated hereby.

SECTION 2.  Representations and Warranties of the
Purchaser.  The Purchaser represents and warrants to the
Shareholders as follows:

(a)    Organization and Authorization.  The Purchaser is a
corporation duly organized and existing under the laws of the
State of Delaware and has full power and authority to enter
into and carry out its obligations under this Agreement.  The

19

execution and delivery of this Agreement has been duly authorized by the Purchaser and, when executed, this Agreement will be a valid and binding obligation of the Purchaser.

(b)  Conflicts With Other Agreements.  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will violate or constitute a default under the certificate of incorporation or by-laws of the Purchaser or of any agreement or instrument to which the Purchaser is a party or by which its property may be affected.

SECTION 3.  Purchase and Sale of Dixon Stock.

(a)  Agreement to Transfer Dixon Stock.  The Shareholders severally agree to sell and transfer to the Purchaser or its nominee on the Date of Closing (as hereinafter defined), and the Purchaser agrees that it or its nominee will purchase from the Shareholders, the number of shares of Dixon Stock set forth opposite each Shareholder's name in Section 1 (p) hereof.

(b)  Purchase Price.  The aggregate purchase price for the Dixon Stock shall be $17,030,771.00, (the "Purchase Price") to be allocated among the Shareholders pro rata according to the ratio which the number of shares of Dixon Stock owned by each Shareholder bears to the total number of shares of Dixon Stock issued and outstanding.

(c)  Payment of Purchase Price.  The Purchase Price shall be paid as follows:

(i)    Those Shareholders who elect to receive cash shall be paid in cash by the Purchaser at the Closing. Simultaneously therewith such Shareholders shall pay $_____ (which amount shall bear the same ratio to $1,000,000 as the total amount received by such Shareholder bears to the Purchase Price) to First Alabama Bank of Montgomery, N.A. as escrow agent (the "Escrow Agent") for the account of such Shareholders in accordance with the provisions of an escrow agreement (the "Escrow Agreement") to be entered into on the Date of Closing between the Purchaser, those Shareholders participating in said Escrow Agreement and the Escrow Agent, which Escrow Agreement will be substantially in the form of the draft attached hereto as Exhibit F.  Subject to the provisions of the Escrow Agreement and Section 8(a) hereof, the Escrow Agent shall disburse to the Shareholders participating in said Escrow Agreement, on a date two years from the Date of Closing, the amount, if any, remaining in escrow.

(ii)    Any Shareholder who notifies the Purchaser in writing not less than seven (7) days prior to the Date of Closing of such Shareholder's desire to receive the portion of the Purchase Price (the "Remaining Purchase Price") allocable to such Purchaser in installments shall receive 25% of such Shareholder's portion of the Purchase Price in cash at the Closing together with a note (the "Note"), the principal amount of which shall be the balance due such Shareholder.  Each Note

21

shall be substantially in the form attached as Exhibit G hereto, with the blanks therein appropriately completed, and, subject to the provisions of Section 8 hereof, shall be paid in three annual installments each in an amount equivalent to 25% of such Shareholder's pro rata share

of the Purchase Price, such installments to be payable commencing January 19, 1979, and on each January 19 thereafter to and including January 19, 1981, until such Shareholder's portion of the Purchase Price has been fully and finally paid. The unpaid balance of such Shareholder's portion of the Purchase Price shall bear interest from the Date of Closing at the rate of ___% per annum. Such interest shall be payable quarter annually on January 1, April 1, July 1, and October 1 of each year commencing on April 1, 1978, until such Shareholder's portion of the Purchase Price has been paid in full. The due and punctual payment of the principal and interest of each Note shall be guaranteed by Tenneco Corporation pursuant to a guaranty (a "Guaranty") substantially in the form of guaranty attached as Exhibit H hereto.

(d)  Closing. A closing (the "Closing") for the sale and transfer of the Dixon Stock shall be held on Thursday, January 19, 1978, or such other date as the Purchaser and the Share-holders shall agree in writing (the "Date of Closing"). The Closing shall be held at the offices of First Alabama Bank of Montgomery, N.A. at 10:00 a.m. unless another hour and place are agreed upon by the Purchaser and the Shareholders.

(e)    Delivery of Certificates.  At the Closing, the various certificates and other documents required by this Agreement shall be delivered; the Shareholders shall deliver to the Purchaser or its nominee, certificates representing the Dixon Stock, in each case duly endorsed for transfer, or with duly endorsed stock powers attached; and the Purchaser or its nominee shall deliver the cash, Notes and Guaranties the respective Shareholders are entitled to receive pursuant to Section 3(c) above.

SECTION 4.  Certain Covenants of the Shareholders.

(a)  Affirmative Obligations.  From and after the date hereof to and including the Date of Closing, the Shareholders will cause Dixon and the Subsidiaries, respectively:

(i)    to continue to conduct their businesses in the ordinary course;

(ii)   to use their best efforts to preserve their business organizations intact and retain the services of their key officers, employees and consultants;

(iii)  to give the Purchaser's representatives full access, during normal business hours and upon reasonable notice, to all the assets, properties, books, records, agreements and commitments of Dixon and the Subsidiaries, and to furnish the Purchaser's representatives during such period with all such information concerning the affairs of Dixon and the Subsidiaries as the Purchaser or its representatives may reasonably request  (except for such information as such

23

companies may be prohibited by law from furnishing); provided, however, that any furnishing of such information to the purchaser or any investigation by the Purchaser shall not affect the Purchaser's right to rely on the representations and warranties made by the Shareholders in this Agreement; and provided further, that the Purchaser will hold in strict confidence all documents and information concerning Dixon and the Subsidiaries so furnished (except that the Purchaser may disclose such documents and information to its independent accountants and to any governmental authority reviewing the transactions contemplated in this Agreement), and, if the transactions contemplated in this Agreement shall not be consummated, such confidence shall be maintained (except to the extent that such information can be shown to be previously known to the Purchaser, in the public domain or later acquired by the Purchaser from other legitimate sources) and all such documents shall immediately thereafter be returned to Dixon and the Subsidiaries;

(iv)    to arrange for their independent accountants to grant representatives of the Purchaser (including, without limitation, the Purchaser's independent public accountants) access to the working papers of such accountants concerning Dixon and the Subsidiaries;

(v)    to maintain all their presently existing insurance coverages and to obtain such additional insurance coverages as the Purchaser shall advise the Shareholders are,

24

in the Purchaser's opinion, reasonably necessary to keep adequately insured all properties of Dixon and the Subsidiaries to the extent such properties are usually insured by corporations engaged in a similar business against loss or damage of the kind customarily insured against by such corporations;

(vi)    to take any necessary corporate and other action and to use their best efforts to obtain any consents and approvals required to enable the Shareholders to carry out the transactions contemplated in this Agreement; and

(vii)   to use their best efforts to cause all the conditions listed in Section 5 of this Agreement to be satisfied on or prior to the Date of Closing.

(b)    Negative Covenants.  From and after the date hereof to and including the Date of Closing, the Shareholders shall not, without the prior written consent of Mr. J. R. Cook, Jr., a Vice President of Tennessee River Pulp & Paper Company, or such other person as Purchaser may designate, cause or permit Dixon or any of the Subsidiaries:

(i)     to authorize or issue any stock of Dixon or any of the subsidiaries;

(ii)    to declare any dividends, other than inter-Company dividends from consolidated Subsidiaries, on their capital stock or make any distribution with respect thereto;

(iii)   to incur, or agree to incur, any indebtedness for money borrowed,

25

(iv)    to grant any fee or salary increase or bonus
ny director, officer or employee or to make any
:ributions to, or commitments with respect to, any profit
:ing or other Employee Benefit Plan other than aggregate
nents in the nature of bonuses of $95,000 and $20,000 to
loyees of Lockhart and D & D, respectively.

(v)    to enter into any contracts or commitments
:ing a term longer than 30 days or involving an amount in
:ess of $5,000;

(vi)    to amend their respective charters or by-laws
less such amendment is necessary to carry out the
ansactions contemplated in this Agreement;

(vii)    to authorize any capital expenditures or
:mmence the construction or acquisition of any facilities
:eviously authorized unless a binding contract has been
itered into prior to the date of this Agreement with respect
) such construction or acquisition;

(viii)    to purchase, lease or otherwise acquire, or
nter into any commitment to acquire, any interest in real
:roperty including, without limitation, any arrangement
:elating to the cutting or use of timber or to the management
)f forestation on or with respect to real property, other than
:ontracts entered into in the ordinary course of business
having terms of 30 days or less and providing for the
acquisition of supplies, raw materials or other materials

26

ecessary for the conduct of the businesses of Dixon and the
ubsidiaries as now being conducted;

(ix)    to sell, mortgage or otherwise alienate or
ncumber the property described in Exhibit C, or any interest
herein including, without limitation, any arrangement relating
to the cutting, sale or use of timber or to the management of
forestation on or with respect to such property, nor to allow
timber now or hereafter on the timberlands described in Exhibit
C to be cut, removed or turpentined.

(x)    to lend or agree to lend any funds to any
person or entity; or

(xi)    to pay, or enter into any commitments with
respect to payment of, any sales commissions or similar fees of
any nature whatsoever other than commissions with regard to the
sale of manufactured products which commissions are customary
in the business in which Dixon or any of the Subsidiaries is
engaged.

(c)    Accuracy of Representations and Warranties.  The
Shareholders shall not take or omit to take any action, or
cause or permit Dixon or any of the Subsidiaries to take or
omit to take any action, which will cause any of the
representations and warranties made by the Shareholders in
Section 1 hereof not to be true on and as of the Date of
Closing with the same force and effect as if such
representations and warranties had been made on and as of the
Date of Closing, and will use their best efforts to cause such

27

representations and warranties to be true on and as of the Date of Closing with the same force and effect as if such representations and warranties had been made on and as of the Date of Closing and to cause to be performed all conditions to the Closing required to be performed by the Shareholders or Dixon or any Subsidiary.

(d)   Fees and Expenses of Shareholders.  All fees and expenses incurred by the Shareholders for advice and counsel and for carrying out the terms and provisions of this Agreement, whether the same be in the nature of fees for financial advice, legal advice, or auditing, shall be paid by the Shareholders individually and shall not be paid from funds of Dixon or the Subsidiaries.

(e)   Title Examination.  The Shareholders shall, at their sole cost and expense, furnish and deliver to the Purchaser a commitment or commitments to insure the title to the real property owned by Dixon or a Subsidiary described in Exhibit C, issued by reputable title insurance companies authorized to do business in the states where the properties are located, said commitments binding said title companies to issue their owner's title policies insuring the title to said properties free and clear of all encumbrances except those set out in Exhibit C, which commitments must be satisfactory to the Purchaser and approved by its counsel.  In the event the Purchaser should desire title insurance, the cost of the premium shall be paid by Dixon and the Subsidiaries, or, at the election of the

28

purchaser, by the Purchaser, but the expense of furnishing said commitments shall be at the expense of the Shareholders. The Shareholders shall have a reasonable time, not to exceed sixty (60) days, in which to furnish to the Purchaser the commitments to insure the title to the property described in Exhibit C owned by Dixon or a Subsidiary, and the Purchaser shall have thirty (30) days after the furnishing by the Shareholders to the Purchaser of said commitments in which to examine the same and have the same examined by its counsel.

(f)     Surveys, Plans and Specifications. Prior to the Closing, the Shareholders shall furnish or cause to be furnished to the Purchaser for its inspection a copy of all surveys, if any, of parcels of real property owned by Dixon and the Subsidiaries and copies of all plans and specifications, if any, of improvements on real property owned or operated by Dixon or the Subsidiaries.

(g)     Estoppel Certificates. The Shareholders shall furnish to the Purchaser prior to Closing, estoppel certificates in a form acceptable to Purchaser from each institution to whom Dixon or the Subsidiaries are indebted for the repayment of money borrowed and from each holder of a lien on any property owned by Dixon or any of the Subsidiaries.

(h)     Indemnification. If the Purchaser or its nominee suffers any damage, loss or injury as the result of the assertion after the Closing of any claim arising out of events which took place prior to the Closing, the Shareholders,

29

jointly and severally, shall indemnify the Purchaser for any such damage, loss or injury suffered by the purchaser or its nominee; provided however, that no claim shall be asserted against the Shareholders pursuant to this Section 4(h) until the aggregate of all claims asserted pursuant to this Section and Section 8(b) shall exceed the sum of $5,000 and no claim for indemnification under this section shall be asserted against the Shareholders for any deficiency in federal or state income taxes which, under then applicable Federal and State law, will be recovered by the Purchaser through tax benefits in later years; and, provided further, that the liability of the Shareholders pursuant to this Section 4(h) and Section 8(b) shall in no event exceed the Purchase Price.

(i)    Antitrust Litigation.   Dixon Plywood, a division of Dixon Lumber Company, is currently a party defendant to certain antitrust litigation brought in the U.S. District Court for the Eastern District of Louisiana styled In Re Plywood Antitrust Litigation (M.D.L. Docket No. 159). Shareholders and Purchaser agree that from and after the Date of Closing, Purchaser shall have full and complete control over said litigation, including the negotiation of any settlement thereof, providing that notice of any proposed settlement in excess of $40,000 be given to the Shareholders or to Robison, Belser, Brewer & Mancuso, counsel for Shareholders. Shareholders agree to indemnify Purchaser against any damages awarded therein against Dixon Lumber Company or the Subsidiaries in excess of $40,000,

30

including costs, and to indemnify Purchaser for any settlement made in such litigation in amounts in excess of $40,000, including costs, by Dixon Lumber Company or the Subsidiaries.

SECTION 5.  Conditions Precedent to the Purchaser's Obligations.  The Purchaser's obligation to purchase the Dixon Stock as set forth in Section 3 hereof shall be subject to the satisfaction on the Date of Closing of all of the following conditions:

(a)    Noncompetition Agreements.  Each of the Shareholders who shall have been requested by the Purchaser to do so shall have entered into a Noncompetition Agreement substantially in the form set forth in Exhibit I.

(b)    Management Contract.  The Shareholders named in Exhibit J shall have entered into a Management Contract with the Purchaser or its nominee substantially in the form set forth in Exhibit J with respect to approximately 60,000 acres of timberland described therein.

(c)    Purchase and Sale Agreement.  The Shareholders named in Exhibit K shall have agreed to sell to the Purchaser or its nominee approximately 18,508 acres of timberland which are described in Exhibit K pursuant to a Purchase and Sale Agreement substantially in the form set forth in Exhibit K; in the event the Shareholders do not have good and marketable title to any such acreage, they shall have substituted other similar acreage in the same general geographic area, acceptable

31

to the Purchaser, and sold the same to Purchaser in accordance with the provisions of such Purchase and Sale Agreement.

(d)     Purchase of Conecuh Stock.  The Purchaser and Edwin McIntyre (or his heirs, successors or assigns) shall have entered into an agreement substantially in the form set forth in Exhibit L providing for the purchase by the Purchaser of the 150 shares of Common Stock of Conecuh owned of record at the date hereof by Edwin McIntyre as set forth in Section 1 (c) (iii) hereof, and the Purchaser shall have purchased such shares of capital stock of Conecuh as set forth in such agreement.

(e)     Opinion of Counsel.  The Purchaser shall have received from Robison, Belser, Brewer & Mancuso, P.A., counsel for the Shareholders, a favorable opinion dated the Date of Closing, in form and substance satisfactory to the Purchaser and its counsel to the effect set forth in subsections (a) through (d) and (j) of Section 1 hereof and to the further effect that:

(i)     This Agreement has been duly executed and delivered by all of the holders of issued and outstanding capital stock of Dixon and is the valid and binding obligation of each such holder of issued and outstanding capital stock of Dixon in accordance with its terms;

(ii)     The Dixon Stock deliverable by each Shareholder pursuant to the terms of this Agreement is free and clear of all liens, encumbrances, equities, claims and

32

restrictions and will be transferred to the Purchaser or its nominee at the Date of Closing and such transfer will have been made in full compliance with all applicable laws, rules and regulations. (In expressing the opinion called for in this subparagraph, such counsel shall be entitled to rely upon the written representation of each Shareholder);

(iii)  Such counsel does not know of any pending litigation, governmental investigation or proceeding to which Dixon or any Subsidiary or any Shareholder is a party, nor any threatened litigation, governmental investigation or proceeding against or involving Dixon or any Subsidiary or any Shareholder, which would inhibit the Closing under this Agreement or adversely affect the property or assets of Dixon or any Subsidiary; and

(iv)  As to such other matters incident to the transactions herein contemplated, as the Purchaser or its counsel may reasonably request, including the form of all documents and the validity of all proceedings required by or incident to the Closing under this Agreement.

(v)  In giving the opinion called for in this Section 5, such counsel may rely, as to matters of law, upon the opinion of other counsel satisfactory to them and, as to matters of fact, upon certificates of officers of Dixon or of the Shareholders, provided that such counsel shall deliver copies thereof to Purchaser prior to the Closing Date.

33

(f)    Certificate Regarding Liens and Claims.  The shareholders shall have delivered to the Purchaser certificates dated the Date of Closing and signed by the President and the Treasurer of Dixon and each of the Subsidiaries, certifying that there exist no liens, encumbrances or adverse claim to any of the real or personal property, tangible or intangible, of Dixon or such Subsidiary, or any indebtedness or contingent liability of Dixon or such Subsidiary except as set forth in this Agreement or the Exhibits hereto.

(g)    Evidence of Good Title.  The Purchaser shall have received from the Shareholders or Dixon and the Subsidiaries evidence satisfactory to the Purchaser and its counsel that Dixon and the Subsidiaries have good and marketable fee simple title without emcumbrances of any kind other than those described in Exhibit C to the real property owned by Dixon or a Subsidiary as described in Exhibit C, including any title insurance policies, real estate surveys, if any, and estoppel certificates with respect to such properties which the Purchaser is entitled to receive pursuant to subsections (e), (f) and (g) of Section 4 hereof, and there shall have been no damage to any part of the property described in Exhibit C, including the improvements included thereon.

(h)    Officers' Certificates.  The Purchaser shall have received on the Date of Closing certificates of the President and the Treasurer of Dixon and each Subsidiary that since the respective Balance Sheet Dates of such companies there has been no material adverse change in the current or prospective

34

business or condition (financial or otherwise) of Dixon or such subsidiary from that set forth in the balance sheets included in the Financial Statements, other than changes brought about through transactions in the ordinary course of business.

(i) <u>Certificate Regarding Representations and Warranties</u>. The representations and warranties of the shareholders contained in Section 1 hereof shall be true on and as of the Date of Closing with the same force and effect as though such representations and warranties had been made on and as of the Date of Closing, and the Shareholders shall deliver to the Purchaser on the Date of Closing certificates executed by the respective Shareholders to such effect.

(j) <u>Performance of Obligations</u>. All obligations required by the terms of this Agreement to be performed by Shareholders on or before the Date of Closing shall have been performed on or before the Date of Closing.

(k) <u>Resignations</u>. The Purchaser shall have received the written resignations, effective as of the Date of Closing, of such directors and officers of Dixon and the Subsidiaries as the Purchaser shall have requested in writing delivered to the Shareholders or their counsel not less than three days prior to the Date of Closing.

(l) <u>Absence of Legal Proceedings</u>. No action or proceeding before any court or any governmental agency or body shall have been instituted or threatened to restrain or prohibit the acquisition by the Purchaser of the Dixon Stock or

35

the transactions contemplated by the various agreements, the forms of which are attached as Exhibits I, J, K and L.

(m)    Transfer of All Dixon Stock.  All of the issued and outstanding capital stock of Dixon shall have been delivered for transfer to the Purchaser or its nominee on the Date of Closing, free and clear of all liens, encumbrances, charges and assessments other than a lien for federal and state estate taxes on stock held by the estate of Charles Dixon.

SECTION 6.  Conditions Precedent to the Shareholders' Obligations.  The obligation of each Shareholder to sell and transfer to the Purchaser or its nominee the Dixon Stock owned by him shall be subject to the satisfaction on the Date of Closing of all of the following conditions:

(a)    Accuracy of Representations and Warranties, Etc. The representations and warranties of the Purchaser contained in Section 2 shall be true on and as of the Date of Closing and the Purchaser shall have performed all of its obligations and agreements hereunder to be performed by it on or before the Date of Closing.

(b)    Delivery of Consideration.  The Purchaser or its nominee shall have delivered to each of the Shareholders the cash, Notes and Guaranties which the respective Shareholders are entitled to receive pursuant to Section 3 (c) hereof.

(c)    Indemnification Agreement.  The Purchaser shall have agreed in writing to indemnify those Shareholders who have individually guaranteed loans made to Dixon or the Subsidiaries

36

by the Federal Land Bank for the purchase of real property owned by Dixon or the Subsidiaries.

(d)  Opinion of Counsel.  The Shareholders shall have received a signed copy of a favorable opinion of counsel for purchaser, who may be an employee of Purchaser or an affiliate of Purchaser, as to the matters referred to in Section 2(a) hereof and as to such other matters as the Shareholders may reasonably request.

(e)  Performance of Obligations.  All obligations required by the terms of this Agreement to be performed by purchasers on or before the Date of Closing shall have been performed on or before the Date of Closing.

SECTION 7.  Termination, Waiver, Etc.

(a)  Termination by the Shareholders.  The Shareholders may terminate this Agreement if the conditions set forth in Section 6 have not been met (or waived by the Shareholders) on or before the Date of Closing.

(b)  Remedies of Purchaser.  In the event the Shareholders fail to perform their obligations under this Agreement, the Purchaser may, at its election, take any one or more of the following actions, in addition to pursuing any other rights or remedies provided by this Agreement or which are available at law or in equity:

(i)  Termination by the Purchaser.  The Purchaser may terminate this Agreement if the conditions set forth in Section 5 have not been met (or waived by the Purchaser) on or before the Date of Closing.

37

(ii)    Defects of Title, Damage to Property, Etc.

In the event that Dixon or the Subsidiaries do not have good and marketable fee simple title to any part of the property described in Exhibit C and represented to be owned by Dixon or a Subsidiary, or if any encumbrances with respect to such property exist other than those described in Exhibit C, or if there is any material damage to any part of the property described in Exhibit C, including any improvements thereon represented to be owned by Dixon or a Subsidiary, after the date hereof to and including the Date of Closing, then the purchaser may, at its option, proceed with the purchase of the Dixon Stock contemplated by this Agreement and obtain a reduction in the Purchase Price equal to the fair market value of the property in which title has failed, or in which there is a defect or which has been damaged, less any amounts received by Dixon or a Subsidiary from insurance coverage therefor. Such fair market value to be determined by the agreement of the Shareholders and the Purchaser and, if the Shareholders and the Purchaser cannot agree as to such value within ten (10) days after the Purchaser notifies the Shareholders of its objection to any such failure, defect or damage, then the Shareholders and the Purchaser shall each appoint an appraiser and the two appointed appraisers shall appoint a third appraiser and the three appointed appraisers shall meet and determine the fair market value of the property on which title has failed or in which there is a defect or which has been damaged, which value shall be binding upon the Shareholders and the Purchaser.

38

(iii)  <u>Nondelivery of Shares of Dixon Stock</u>.  If any of the issued and outstanding shares of Dixon Stock are not delivered for transfer to the Purchaser or its nominee on the Date of Closing, the Purchaser may, at its election, acquire all the remaining shares of Dixon Stock, in which event the purchase Price shall be reduced in proportion to the reduction in the number of shares of Dixon Stock acquired.

(c)  <u>Waiver</u>.  The Purchaser or the Shareholders may, by an instrument in writing, extend the time for or waive the performance of any of the obligations of the other or waive compliance by the other with any of the covenants or conditions contained in this Agreement.

(d)  <u>Specific Performance, Other Remedies</u>.  In addition to, and not by limitation of, any of the rights or remedies of the Shareholders and the Purchaser set forth herein, the Purchaser and the Shareholders shall have the right to seek full and specific performance of this Agreement and may pursue such other remedies which may be available at law or in equity.

<u>SECTION 8.  Survival after Closing and Indemnification</u>.

(a)  <u>Survival of Representations, Etc</u>.  The representations, warranties and agreements of the Shareholders and the Purchaser made herein and made by the Shareholders in their certificates delivered pursuant to Section 5 hereof shall survive the consummation of the sale of Dixon Stock pursuant hereto for a period of 2 years from the Date of Closing, or until the final disposition of any claims asserted by the

39

purchaser pursuant to this Agreement prior to the expiration of such period; provided however, that the Shareholder's representation and warranty contained in Section 4(i) shall survive until the termination of the litigation described in Section 4(i) and until the satisfaction of any claim of the purchaser against the Shareholder pursuant to said Section 4(i).

If no claim or claims arising out of those representations, warranties and covenants of the Shareholders other than those contained in Section 4(i) hereof have been asserted by the Purchaser prior to the expiration of two years following the Date of Closing, the Shareholders shall be released and discharged from any liability under the provisions of this Agreement other than those of Section 4(i) hereof.

Upon the final disposition of the litigation described in Section 4(i) hereof and of any claims which the Purchaser may assert against the Shareholders under said Section 4(i), the Shareholders shall be released and discharged from any additional liability under this Agreement.

(b)   Liability of the Shareholders.  The Shareholders shall be jointly and severally liable to the Purchaser for any loss, damage or liability incurred by the Purchaser arising out of the breach of any representation, warranty or covenant made by the Shareholders herein; provided, however, that no claim under this Section shall be asserted against the Shareholders until the aggregate amount of all claims asserted hereunder, if any, exceeds $5,000.00.

40

(c)    How Payable.  To the extent sufficient for that purpose, any amounts payable by the Shareholders to the urchaser under this Section 8 shall be payable pro rata from hat portion of the Purchase Price held in escrow pursuant to he provisions of Section 3 (c)(i) hereof and pro rata from the npaid balance of the Purchase Price evidenced by the Notes, and as to any amounts in excess thereof, payments shall be in cash.  In no event shall the liability of the Shareholders exceed the Purchase Price.

(d)    Notice of Claims, Etc.  Except as hereinafter set forth, no claim by the Purchaser or its nominee or the assigns of any of them against the Shareholders shall be valid unless detailed written notice thereof shall have been given to Robison, Belser, Brewer & Mancuso, P.A., counsel for Share- holders within 60 days following the discovery by the Purchaser of facts giving rise to the asserted damage, loss or injury, and no such claim shall be enforced against the Shareholders until such Shareholders shall have been given 90 days in which to cure the asserted damage, loss or injury.  In the event of an examination by any taxing authority of income tax returns filed by Dixon or any Subsidiary, the Purchaser shall cause written notice thereof to be given to the Shareholders within 10 days of the receipt by the Purchaser of notice of any such examination and shall afford the Shareholders with an opportunity to participate in such examination and to defend against any proposed assessment of additional tax or, at the

41

shareholders' election, the right to consult as to any defense conducted by the Purchaser with respect thereto. The shareholders shall bear all costs and expenses with respect to the participation by the Shareholders and such counsel as may be retained by the Shareholders in connection with any tax examination and defense against any proposed assessment of additional tax.

(e)   <u>Arbitration</u>.  Any dispute as to whether Purchaser is entitled to receive payments from the Escrow Fund held in accordance with the Escrow Agreement, and/or to reduce the unpaid principal balance of the Notes, or as to the amount of such payment and/or reduction, shall be submitted to, and settled by, arbitration. Such arbitration shall be effected by arbitrators selected as hereinafter provided and shall be conducted in accordance with the Rules existing at the date hereof of the American Arbitration Association. Disputes hereunder shall be submitted to three arbitrators, one arbitrator being selected by the Purchaser, as one party to the dispute, one arbitrator being selected by Thomas G. Mancuso, Esq., on behalf of the Shareholders, as the other party to the dispute, and the third arbitrator being selected by the two so selected by the parties, or if they cannot agree on a third, by the American Arbitration Association. In the event that either party, within one month after any notification made to it of the demand for arbitration by the other party, shall not have selected its arbitrator and given notice thereof by registered

42

mail to the other party, such arbitrator shall be selected by the American Arbitration Association. The meetings of the arbitrators shall be held in such place or places as may be agreed upon by the arbitrators. The expenses of any such arbitration shall be borne one-half by T. D. Lumber and one-half by the respective Shareholders.

SECTION 9. Miscellaneous.

(a) Notice. All notices and other communications hereunder shall be in writing and delivered or mailed by registered mail as follows:

To the Shareholders:

        Robison, Belser, Brewer & Mancuso, P.A.
        Attorneys and Counselor at Law
        P. O. Drawer 1470
        Montgomery, Alabama  36102
        Attn:  Thomas G. Mancuso, Esq.

To the Purchaser:

        Fred B. Schelhorn, President
        Tennessee River Pulp & Paper Company
        P. O. Box 33
        Counce, Tennessee  38326

With copies to:

        M. W. Meyer, Associate General Counsel
        Tenneco Inc.
        P. O. Box 2511
        Houston, Texas  77001

        and

        E. J. Kenn, Vice President and General Counsel
        Packaging Corporation of America
        1603 Orrington Avenue
        Evanston, Illinois  60204

or such other address for any party as such party shall designate in writing to the other party hereto.

43

(b)    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and the successors and assigns of the Purchaser and the heirs, successors, assigns, administrators and legal representatives of each of the Shareholders.

(c)    <u>Effectiveness of Agreement</u>.  This Agreement will become effective, as of the date first above written.

(d)    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

(e)    <u>Captions</u>.  The captions in this Agreement are included for convenience of reference only and shall be of no force or effect in construing or determining the provisions hereof.

(f)    <u>Entire Agreement</u>.  This Agreement contains the entire agreement of the Purchaser and the Shareholders with respect to the subject matter hereof and supersedes all prior agreements of the parties.

IN WITNESS WHEREOF, each of the Shareholders has hereunto affixed his signature, and the Purchaser has caused its corporate name to be subscribed and its corporate seal to be affixed by its officers thereunto duly authorized on one or more counterparts of this Agreement, all of which counterparts

44

shall be read together and be construed as but one and the same
instrument, as of the day and year first above written.

PURCHASER

By: _F. B. Achelbom_____
                              President

ATTEST:

_____
                Secretary

SHAREHOLDERS

_____
Thelma Dixon, Co-Executrix of the
Estate of Charles Dixon, Deceased
Address: _____
_____

_____
Catherine Dixon Roland,
Co-Executrix of the Estate of
Charles Dixon, Deceased
Address: _____
_____

_____
Thelma Dixon
Address: _____
_____

_____
Solon Dixon
Address: _____
_____

45

SHAREHOLDERS (continued)

Solon Dixon, Co-Trustee of Trust
Created Under the Will of Ellie
Dixon, Deceased
Address: _____

The Commercial Bank, Co-Trustee
of Trust Created Under the Will
of Ellie Dixon, Deceased
Address: P.O. DRAWER 1298
ANDALUSIA, AL 36420

C. M. Jackson
Address: _____

Grover Little
Address: _____

Grover Nell Little Tadlock
Address: _____

Terrell D. Little
Address: _____

John E. Vick
Address: 511 CHAPMAN ST.
ANDALUSIA, AL 36420

46

SHAREHOLDERS (continued)

Catherine D. Roland
Address: _____

Thelma Dixon, Co-Trustee of
Trust Under the Will of
Marjorie Dixon Vick, Deceased
Address: _____

John E. Vick, Co-Trustee of
Trust Under the Will of Marjorie
Dixon Vick, Deceased
Address: _511 CHAPMAN ST_
_ANDALUSIA, AL 36420_

//

47